# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| JAMARR FOWLER,<br>*Plaintiff*, | |
| v. | No. 3:17-cv-00848 (JAM) |
| DEPARTMENT OF CORRECTION, *et al.*,<br>*Defendants*. | |

## INITIAL REVIEW ORDER PURSUANT TO 28 U.S.C. § 1915A

Plaintiff Jamarr Fowler is a prisoner in the custody of the Connecticut Department of Correction. He has filed a complaint *pro se* and *in forma pauperis*, against the Connecticut Department of Correction ("DOC") and 32 individual prison officials. Plaintiff, who is hearing impaired, alleges that defendants violated his rights under the Americans with Disabilities Act, Rehabilitation Act, First Amendment, Eighth Amendment, and Fourteenth Amendment. Based on my initial review pursuant to 28 U.S.C. § 1915A, I conclude that plaintiff's complaint should be served on 28 of the 33 defendants.

### BACKGROUND

The following allegations from plaintiff's complaint are accepted as true for purposes of the Court's initial review. Plaintiff has a hearing-related disability.[1] On January 29, 2016, he was transferred to Osborn Correctional Institution ("Osborn") and was improperly placed in the "E-Block" unit as opposed to the unit for disabled inmates, as previously ordered by a physician, Dr. Brenton. When plaintiff asked the correctional staff why he was not being placed in the disability unit, he was told that he had to be placed in E-Block because of a disciplinary report that he

---

[1] Plaintiff also alleges that he has "another physical disability" in addition to being "hearing impaired/deaf," Doc. #1-1 at 7 (¶ 37), but he does not specify what the other physical disability is.

received at a previous facility. Plaintiff later learned that there was nothing in DOC's administrative directives that confirmed what he was told. He immediately filed written grievances to defendants Maldonado, Wright, and Long, requesting that he be transferred out of E-Block and housed in the disability unit. No one responded in writing to his complaints. *Id.* at 7–9 (¶¶ 38–39).

Although E-Block is classified as a "general population" unit, the inmates housed in E-Block are subjected to greater restrictions than those inmates in other units, including the disabled inmate unit. For example, E-Block inmates are locked in their cells for 22 hours per day, whereas inmates in the other general population units are outside their cells for the majority of the day. E-Block inmates may only use the law library twice per month for 45 minutes whereas other inmates may use it four to five times per week. E-Block inmates are also not permitted recreation time to exercise, cannot obtain hot water to make food, and are forced to wear bright yellow jumpsuits as opposed to more comfortable clothing. *Id.* at 9–10 (¶ 40).

After several weeks in E-Block, plaintiff was transferred to F-Block, another restrictive housing unit. Again, he was locked in his cell for 22 hours per day. When he was let out of his cell, he was forced to choose between taking a shower, attending religious services, or using the telephone. Such a restriction did not apply to other general population inmates. Plaintiff had very limited access to the telephone, and on the rare occasions when he was permitted to use the phone, his time was cut short. Plaintiff continued to make verbal complaints and file written grievances about his treatment. *Id.* at 11 (¶ 42–43).

After several weeks in F-Block, plaintiff was transferred again—this time to C-Block, another restrictive housing unit. While housed in C-Block, plaintiff was again subjected to the same restrictive and punitive treatment as in F-Block. In addition, defendant Colon completely

denied plaintiff access to the telephone during the day. When plaintiff filed complaints against Colon, Colon instructed other correctional officers to falsify disciplinary reports against plaintiff and to prevent him from using the telephone. *Id.* at 11–12 (¶¶ 43–45).

Sometime during his placement in C-Block, plaintiff and plaintiff's family members contacted defendant Martucci, Director of External Affairs for DOC, and complained about plaintiff's treatment. Martucci informed plaintiff and his family that she was going to organize a meeting between plaintiff, Maldonado, and defendant Gallagher, the Health Services Coordinator, to "work out a plan that would be good for everybody." That meeting never occurred. Gallagher eventually met with plaintiff, but she ended up placing plaintiff on an even more restrictive housing plan. *Id.* at 12 (¶ 45).

Plaintiff then sent Martucci a letter, requesting that he be afforded reasonable accommodations and all of the same rights and privileges as other disabled inmates. Martucci responded with a letter informing plaintiff that all of his issues "have been thoroughly addressed" by Maldonado and his facility team. Plaintiff attempted to follow up with Martucci and explain that none of his issues had been addressed, but his requests were ignored. *Id.* at 13 (¶ 46).

On April 4, 2016, in retaliation for plaintiff's filing of grievances, Maldonado transferred plaintiff to Corrigan Correctional Institution ("Corrigan"), a level-four maximum security prison that is much more restrictive than Osborn. Plaintiff alleges that Maldonado transferred plaintiff to Corrigan in order to prevent him from completing the programs he needs in order to be granted parole. *Id.* at 13–14 (¶ 47). While at Corrigan, plaintiff was only permitted to use the telephone on a "handful of occasions." *Id.* at 14 (¶ 48). Defendants Santiago, Martin, Zegarzewski, and Gillette, all employees of Corrigan, told plaintiff that he would not be permitted to use the telephone during his evening recreation period, on weekends, or on holidays,

and that he would only be allowed to use the phone "at [his] counselor's convenience." *Ibid.* These restrictions did not apply to hearing inmates, and they also contradict the DOC's administrative directives, which provide that hearing-impaired inmates be permitted additional time to use the telephone. *Ibid.*

Plaintiff filed numerous complaints and grievances "to the commissioner's office" and within the facility regarding his transfer to Corrigan and the denial of reasonable accommodations, alleging that defendants Marga, Vazquez, Martin, Zegarzewski, and Santiago were retaliating against him, but all his complaints went unanswered. In a further effort to punish plaintiff, Gillette placed plaintiff in the restrictive housing unit under administrative detention for making eleven phone calls to his family on May 6, 2016. However, because only two of the eleven calls were answered and the other nine went to voicemail, plaintiff's actions did not violate any DOC policy. *Id.* at 15 (¶ 49).

Plaintiff did not receive a copy of the disciplinary report for the eleven phone calls until May 11, in violation of DOC's administrative directives, which required disciplinary reports to be served on inmates within 24 hours. A correctional officer falsified the date of service on the report, stating that it was served on May 9. Plaintiff complained to defendants Nemeth and Dousis (both disciplinary investigators) that he did not receive the report in a timely manner and that it contained false information. Nemeth and Dousis told plaintiff to direct his complaint to defendant Conger. When plaintiff complained to Conger, Conger told plaintiff that he believed Gillette and not plaintiff, and that it was not Conger's job to decide whether plaintiff was timely served with a copy of a disciplinary report. Plaintiff then complained to defendants Santiago and Martin, who responded with a statement to plaintiff that "due process was followed." *Id.* at 16 (¶ 50).

On May 12, 2016, Corrigan staff held a hearing regarding plaintiff's three disciplinary reports. Defendants Nemeth and Dousis denied plaintiff's requests to produce witnesses and documentary evidence in support of his defense and refused to investigate and gather evidence in connection with the reports. Plaintiff requested a continuance of the hearing so that he could obtain replacement hearing aids. He also requested that the hearing be conducted in a quieter room. Defendant Richardson, the hearing officer, denied both requests. When plaintiff questioned Richardson about his decision, Richardson "kicked [plaintiff] out of the hearing" and disciplined him with 40 days of punitive segregation, 8 months loss of commissary, 90 days loss of phone privileges, 60 days loss of jailhouse visits, and 40 days loss of good time credit. *Id.* at 17 (¶ 51).

Plaintiff appealed Richardson's decision and disciplinary action to defendant Quiros, the district administrator. Quiros granted in part and denied in part plaintiff's appeal, ordering Santiago to release plaintiff from punitive segregation by June 1, 2016. Again acting in retaliation, Santiago did not release plaintiff until June 2. While in punitive segregation, plaintiff was subjected to poor ventilation and extremely cold temperatures, which caused him to suffer from allergic reactions, infections, and extreme chest pain. He had to be given special medication in addition to his regular asthma medication "to keep him alive." *Id.* at 18 (¶ 52). He was denied regular access to personal hygiene products, barber services, recreation, and showers. In addition, correctional staff threw away his legal mail, and defendants Conger, Santiago, Martin, and Zegarzeski denied plaintiff access to legal books from the law library, causing plaintiff to lose two of his *pro se* post-judgment motions for release. *Id.* at 18–19 (¶ 52).

After he was released from punitive segregation, plaintiff continued to be denied access to the phone. Santiago, Martin, Gillette, and Zegarzewski often threatened to punish plaintiff if

he made too many phone calls. Gillette personally read plaintiff's incoming and outgoing mail and monitored his phone conversations. At one point, Gillette told plaintiff that he had learned about plaintiff's connections to two particular women, both of whom Gillette falsely claimed had obtained no-contact orders against plaintiff. Gillette threatened to place plaintiff in restrictive housing if he contacted the women again. *Id.* at 19 (¶ 52).

After several months, plaintiff was transferred back to Osborn and placed in E-Block. Plaintiff alleges that the transfer and placement were the result of a collaborative effort by defendants Marga, Vazquez, Semple, Maldonado, Santiago, Chapdelaine, Wright, and Colon to retaliate against plaintiff for the numerous complaints and grievances he had filed throughout his incarceration. When plaintiff arrived back at Osborn, Colon "forced officers to deny [plaintiff] access to his reasonable accommodations," including his use of the TTY telephone. *Id.* at 20 (¶ 53). Colon also unlawfully went through plaintiff's medical file, obtained records regarding his medical conditions and treatment plan, and posted copies of those records in the medical unit and outside plaintiff's housing unit where other inmates and officers could read them. Plaintiff immediately complained to Gallagher and Maurer about Colon's actions. Gallagher directed Colon to take down the documents but failed to take any other remedial action. *Id.* at 21 (¶ 53).

In September 2016, Maldonado, Marga, and Vazquez transferred plaintiff back to Corrigan in an act of retaliation. When he arrived at Corrigan, plaintiff was notified that he was being immediately sent back to Osborn. Within 24 hours, he arrived back at Osborn and was placed in the B-Block unit. B-Block houses inmates who work in institutional jobs. While housed in B-Block, plaintiff was again subjected to 22-hour lockdown and denied rights and privileges afforded to other B-Block inmates. When he filed more complaints and grievances about being denied rights and privileges afforded to other B-Block inmates, defendants

Maldonado, Wright, Semple, and Griffen informed him that he would have to obtain employment within the facility to receive the privileges to which he was referring. Plaintiff replied that he should be entitled to the privileges whether or not he had a job, but defendants did not respond. *Id.* at 21–22 (¶ 54).

On December 12, 2016, Colon falsified a disciplinary report against plaintiff, charging him with "giving false information." *Id.* at 22 (¶ 55). On January 18, 2017, Maldonado, Griffen, and Colon placed plaintiff in restrictive housing as a result of the report. A hearing was held on January 24, 2017. Defendants Lizon and Maldonado ultimately dismissed the report because Colon was not authorized to author disciplinary reports against plaintiff due to a department policy. Despite the dismissal, plaintiff was placed on high-security status in accordance with Commissioner Semple's policy that permitted supervisors to place inmates on high-security status without a hearing. *Id.* at 23 (¶ 55).

On January 26, 2017, plaintiff's security level was raised from three to four, and he was transferred to MacDougall, a level-four maximum security prison where he currently resides. At MacDougall, plaintiff continues to be "targeted, oppressed, psychologically tortured, [and] retaliated [and] discriminated against." *Ibid.* Plaintiff appealed his placement on high-security status to Deputy Commissioner Rinaldi. Rinaldi received plaintiff's appeal on February 2, 2017. Rinaldi denied the appeal on March 13, but plaintiff did not receive the disposition until March 24, which violated the established timeframe set by DOC. *Id.* at 23–24 (¶ 55).

On February 7, 2017, defendant Santana issued plaintiff a false disciplinary report for attempting to attend gym recreation with other inmates in his unit. Santana prohibited plaintiff from going to gym recreation and charged him with flagrant disobedience. Plaintiff was forced under duress to plead guilty to the offense, which led to his placement in Q-pod, a punitive

segregation housing unit. Plaintiff alleges that this placement was a result of a discriminatory policy created by defendants Chapdelaine, Santana, and Dousis to restrict gym recreation to certain inmates only. Furthermore, he alleges that defendants Santana, Chapdelaine, Roy, and Collins created an "unconstitutionally systematic tactic to punish [plaintiff] [and] unjustly place him in" a restrictive housing unit by forcing him to plead guilty to the disciplinary charge. Plaintiff alleges that Commissioner Semple is aware of this conduct and has done nothing to rectify it. *Id.* at 24–25 (¶ 56).

After plaintiff was placed in Q-pod, he immediately notified correctional staff that there were no medical emergency call boxes in the unit and that, because of his medical conditions and disabilities, he was only supposed to be housed in a unit with a medical emergency call box. As a result, plaintiff was transferred to M-pod, a general population unit with medical emergency call boxes inside the cells. But when defendants Chapdelaine and Hall found out that plaintiff had left Q-pod, they convinced defendant Leightner, the health services administrator, to authorize his removal from M-pod and place him back in Q-pod. *Id.* at 26 (¶ 57).

In late February 2017, plaintiff received another false disciplinary report accusing him of attempting to use the phone without authorization. Defendants Chapdelaine, Gonzalez, Rule, Roy, and Congelos then employed a "systematic tactic" to punish plaintiff by forcing him into a restrictive housing unit for 15 days prior to his hearing on the disciplinary report, intentionally delaying his hearing (and then covering up the fact that it was untimely), finding him guilty of the disciplinary violation, and then sentencing him to 15 days of punitive segregation, 30 days loss of recreation, and 90 days loss of phone. Plaintiff appealed the decision on the report to defendant Quiros, who denied the appeal. While housed in the restrictive Q-pod, plaintiff was denied rights and privileges afforded to other general population inmates, including gym

recreation and sufficient time outside of his cell. Plaintiff alleges that Chapdelaine is keeping plaintiff housed in Q-pod as a form of retaliatory punishment, and both Semple and Quiros are aware of Chapdelaine's actions.

Plaintiff claims that defendants violated his rights under the First, Eighth, and Fourteenth Amendments to the United States Constitution, Title II of the Americans with Disabilities Act, and § 504 of the Rehabilitation Act. He seeks monetary relief in the amount of ten million dollars. He has named 33 defendants in total, including the DOC and 32 prison officials in their individual capacities.

## DISCUSSION

Pursuant to 28 U.S.C. § 1915A(a), the Court must review prisoner civil complaints and dismiss any portion of the complaint that is frivolous or malicious, that fails to state a claim upon which relief may be granted, or that seeks monetary relief from a defendant who is immune from such relief. The Court must accept as true all factual matters alleged in a complaint, although a complaint may not survive unless its factual recitations state a claim to relief that is plausible on its face. *See, e.g.*, *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Mastafa v. Chevron Corp.*, 770 F.3d 170, 177 (2d Cir. 2014) (same). Nevertheless, it is well-established that "pro se complaints 'must be construed liberally and interpreted to raise the strongest arguments that they suggest.'" *Sykes v. Bank of Am.*, 723 F.3d 399, 403 (2d Cir. 2013) (quoting *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474 (2d Cir. 2006)); *see also Tracy v. Freshwater*, 623 F.3d 90, 101–02 (2d Cir. 2010) (discussing special rules of solicitude for *pro se* litigants).

### *Discrimination under ADA and Rehabilitation Act*

Plaintiff alleges that the DOC and various individual defendants violated Title II of the Americans with Disabilities Act ("ADA") and § 504 of the Rehabilitation Act by failing to

provide him with reasonable accommodations for his hearing disability. To state a *prima facie* claim for discrimination under the ADA or the Rehabilitation Act, a plaintiff must allege: (1) that he is a "qualified individual" with a disability; (2) that he was excluded from participation in a public entity's services, programs, or activities, or was otherwise discriminated against by a public entity; and (3) that such exclusion or discrimination was due to his disability. *Fulton v. Goord*, 591 F.3d 37, 43 (2d Cir. 2009). "A qualified individual can base a discrimination claim on . . . failure to make a reasonable accommodation." *Ibid.* (internal quotation marks and citation omitted).

Plaintiff has sued the individual defendants in their individual capacities, but "neither Title II of the ADA nor § 504 of the Rehabilitation Act provides for individual capacity suits against state officials." *Garcia v. S.U.N.Y. Health Sciences Center of Brooklyn*, 280 F.3d 98, 107 (2d Cir. 2001). Accordingly, I will dismiss plaintiff's claims under the ADA and the Rehabilitation Act against the individual defendants.

A plaintiff may, however, bring a Title II ADA claim against a state or its agent in its official capacity for monetary damages. *See Garcia*, 280 F.3d at 111. A plaintiff may also bring an official capacity suit against a state or its agent under § 504 of the Rehabilitation Act. *See Super v. J. D'Amelia & Associates, LLC*, 2010 WL 3926887, at *13 (D. Conn. 2010) (explaining that Connecticut's continued acceptance of federal funds constitutes a waiver of its immunity from suit under § 504 of the Rehabilitation Act).

Plaintiff has plausibly alleged a discrimination claim against the DOC under Title II of the ADA and § 504 of the Rehabilitation Act. His "hearing impairment makes him a 'qualified individual'" with a disability. *Valanzuolo v. City of New Haven*, 972 F. Supp. 2d 263, 273 (D. Conn. 2013). He alleges that the DOC failed to place him in a special unit for disabled inmates

and failed to afford him additional time to use the telephone. He also alleges that he was kicked out of a disciplinary hearing after he requested a continuance so that he could obtain replacement hearing aids and after he requested a transfer to a quieter room so that he could better hear the proceedings. Plaintiff's discrimination claim under the ADA and the Rehabilitation Act will proceed against the DOC.

### Constitutional claims against DOC

In addition to his claims under the ADA and Rehabilitation Act, plaintiff brings claims against the DOC under 42 U.S.C. § 1983 for violations of his constitutional rights. The DOC is a state agency and is not considered a person within the meaning of § 1983. *See Will v. Michigan Dep't of State Police*, 491 U.S. 58, 70–71 (1989). Thus, plaintiff's § 1983 claims against DOC are dismissed pursuant to 28 U.S.C. § 1915A(b)(1).

### Retaliation

Plaintiff claims that defendants Semple, Martucci, Maldonado, Wright, Colon, Santiago, Martin, Zegarzewski, Gillette, Richardson, Chapdelaine, Roy, Rule, Gonzalez, Collins, Congelos, Santana, Hall, Vazquez, Leightner, Marga, Griffen, Lizon, and Rinaldi violated his right to free speech under the First Amendment by retaliating against him for submitting complaints and grievances.

In order to state a First Amendment free-speech retaliation claim, a plaintiff must demonstrate that he was engaged in constitutionally protected speech activity, that the defendant took adverse action against him, and that there was a causal connection between the protected activity and the adverse action. *See Dolan v. Connolly*, 794 F.3d 290, 294 (2d Cir. 2015). Filing grievances or lawsuits against correctional staff is protected activity. *Davis v. Goord*, 320 F.3d 346, 352–53 (2d Cir. 2003).

Plaintiff has adequately alleged retaliation claims against defendants Maldonado, Vazquez, Marga, Colon, Griffen, Richardson, Chapdelaine, Hall, and Leightner. Plaintiff contends that each of these defendants took action against him for filing grievances. Maldonado, Vazquez, and Marga transferred him to more restrictive and disciplinary facilities and units in response to his filing of grievances. Colon ordered others to falsify disciplinary reports against him and deny him access to the telephone, posted copies of his private medical records throughout Osborn, and authored false disciplinary reports against him. Griffen took part in placing plaintiff in restrictive housing based on a false disciplinary report. Richardson kicked him out of his disciplinary hearing and disciplined him harshly. Chapdelaine and Hall convinced Leightner to take plaintiff out of M-Pod unit and return him to the Q-pod unit to punish plaintiff for his complaint about the medical emergency call boxes. Because these consequences could plausibly "deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights," they constitute adverse action. *Davis*, 320 F.3d at 353. *See also Davis v. Kelly*, 160 F.3d 917, 920 (2d Cir. 1998) (prison authorities "may not transfer an inmate in retaliation for the exercise of constitutionally protected rights").

As far as the other defendants are concerned, plaintiff's allegations are either entirely conclusory or fail to explain how the defendants' actions were retaliatory in nature. *See Riddick v. Arnone*, 2012 WL 2716355, at *6 (D. Conn. 2012) ("Because claims of retaliation are easily fabricated, the courts consider such claims with skepticism and require that they be supported by specific facts; conclusory statements are not sufficient"). Thus, plaintiff's First Amendment retaliation claims will proceed only against Maldonado, Vazquez, Marga, Colon, Griffen, Richardson, Chapdelaine, Hall, and Leightner.

Although plaintiff brings his retaliation claims under the First Amendment, his complaint can be construed to also raise claims of retaliation under the ADA and the Rehabilitation Act. Title V of the ADA "prohibits, *inter alia*, retaliation against any individual who has asserted rights under the ADA." *Sarno v. Douglas Elliman-Gibbons & Ives, Inc.*, 183 F.3d 155, 159 (2d Cir. 1999). The same standards apply to a claim of retaliation under § 504 of the Rehabilitation Act as under the ADA. *See Treglia v. Town of Manlius*, 313 F.3d 713, 719 (2d Cir. 2002). A plaintiff states a retaliation claim under the ADA or the Rehabilitation Act by establishing that "(i) plaintiff was engaged in protected activity; (ii) the alleged retaliator knew that plaintiff was involved in protected activity; (iii) an adverse decision or course of action was taken against plaintiff; and (iv) a causal connection exists between the protected activity and the adverse action." *Weixel v. Bd. of Educ.*, 287 F.3d 138, 148 (2d Cir. 2002) (internal quotation marks omitted). Insofar as plaintiff alleges that the DOC retaliated against him for requesting reasonable accommodations for his hearing disability, the Court will consider plaintiff to have stated a retaliation claim against DOC under the ADA and the Rehabilitation Act.

### Denial of access to courts

To state a claim for denial of access to the courts, a plaintiff must demonstrate that he suffered an actual injury, *see Lewis v. Casey*, 518 U.S. 343, 353 (1996)—that is, he must allege that "defendant's conduct deprived him of an opportunity to press some nonfrivolous, arguable cause of action in court." *Brown v. Choinski*, 2011 WL 1106232, at *5 (D. Conn. 2011). What this means is that "the underlying cause of action, whether anticipated or lost, is an element that must be described in the complaint, just as much as allegations must describe the official acts frustrating the litigation," and "the underlying cause of action and its lost remedy must be

addressed by allegations in the complaint sufficient to give fair notice to a defendant."
*Christopher v. Harbury*, 536 U.S. 403, 415, 416 (2002).

A plaintiff must describe "the predicate claim . . . well enough to apply the 'nonfrivolous' test and to show that the 'arguable' nature of the underlying claim is more than hope." *Id*. at 416. In this manner, "the complaint should state the underlying claim in accordance with Federal Rule of Civil Procedure 8(a), just as if it were being independently pursued, and a like plain statement should describe any remedy available under the access claim and presently unique to it." *Id.* at 417–18 (footnote omitted).

Plaintiff alleges that Corrigan, Conger, Santiago, Martin, and Zegarzeski denied him access to legal books from the law library, causing him to lose two of his *pro se* post-judgment motions for release. Plaintiff has not provided a sufficiently detailed description of the underlying cause of action. Because of the complaint's sparse allegations, I am unable to ascertain if the underlying claim was of arguable merit or was frivolous.

Because plaintiff's claim of denial of access to the courts has not been adequately pleaded, I will dismiss this claim without prejudice. If plaintiff believes that he is able to allege specific facts concerning the underlying cause of action that was impeded and to show that this action would not have been frivolous, then plaintiff may file an amended complaint within 30 days to allege a claim for denial of his constitutional right of access to the courts.

### Deliberate indifference to medical needs

It is well established that "[a] prison official's 'deliberate indifference' to a substantial risk of serious harm to an inmate violates the Eighth Amendment." *Farmer v. Brennan*, 511 U.S. 825, 828 (1994). A deliberate indifference claim has two component requirements. The first requirement is objective: the alleged deprivation must be serious. The second requirement is

subjective: the charged officials must act with a subjectively reckless state of mind in their denial of medical care. *See Spavone v. New York State Dept. of Correctional Servs.*, 719 F.3d 127, 138 (2d Cir. 2013); *Hilton v. Wright*, 673 F.3d 120, 127 (2d Cir. 2012).

Plaintiff alleges that defendants Semple, Gallagher, Maurer, Martucci, Maldonado, Wright, Long, Colon, Santiago, Martin, Zegarzewski, Gillette, Conger, Chapdelaine, Roy, Rule, Gonzalez, Hall, Leightner, Marga, Griffen, and Lizon acted with deliberate indifference to his medical needs by denying him reasonable accommodations for his disability, forcing him into restrictive housing units, denying him access to gym recreation, showers, and personal hygiene products, and subjecting him to conditions that caused him medical problems and pain. Plaintiff also alleges that defendants denied him reasonable accommodations afforded to other hearing-impaired inmates such as additional telephone time, access to a TTY phone, and access to a medical call box in case of an emergency. Plaintiff's hearing impairment may constitute a "serious medical need" and thus, at this stage, satisfies the objective component of the deliberate indifference standard. *See, e.g.*, *Wheeler v. Butler*, 209 F. App'x 14, 16 (2d Cir. 2006) (hearing-impaired plaintiff who was allegedly deprived of hearing aids may state claim for deliberate indifference); *Clarkson v. Coughlin*, 898 F. Supp. 1019, 1043 (S.D.N.Y. 1995) (failure to provide interpretive services and assistive devices for deaf and hearing-impaired inmates amounted to deliberate indifference). Furthermore, plaintiff alleges that defendants acted intentionally in an effort to punish him and retaliate against him. The Court will allow plaintiff's deliberate indifference claim to proceed against the above-mentioned defendants at this time.

### Due Process

Plaintiff claims that various defendants violated his rights under the Due Process Clause of the Fourteenth Amendment. The Fourteenth Amendment to the United States Constitution

provides that a State shall not "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. The Due Process Clause protects both a right to "substantive" due process and a right to "procedural" due process.

The standard analysis for a claim of a violation of procedural due process "proceeds in two steps: We first ask whether there exists a liberty or property interest of which a person has been deprived, and if so we ask whether the procedures followed by the State were constitutionally sufficient." *Swarthout v. Cooke*, 562 U.S. 216, 219 (2011) (*per curiam*).

 In the prison context (involving someone whose liberty interests have already been severely restricted because of his or her confinement in a prison), a prisoner plaintiff must show that he was subject to an "atypical and significant hardship . . . in relation to the ordinary incidents of prison life." *Sandin v. Conner*, 515 U.S. 472, 484 (1995). In *Sandin*, the Supreme Court concluded that a prisoner who was subject to a disciplinary term of 30 days confinement in restrictive housing did not sustain a deprivation of a liberty interest that was subject to protection under the Due Process Clause. *Id.* at 486. Following *Sandin*, the Second Circuit has explained that courts must examine the actual punishment received, as well as the conditions and duration of the punishment. *See Palmer v. Richards*, 364 F.3d 60, 64 (2d Cir. 2004).

Plaintiff alleges that he was repeatedly and arbitrarily placed in restrictive housing following inadequate hearings or, in some cases, no hearing at all. He alleges that the conditions he experienced in restrictive housing were particularly oppressive (*e.g.*, poor ventilation and extremely cold temperatures) and that he was denied many rights that were afforded to the other inmates in the same restrictive housing units. These facts are sufficient at this stage to suggest that plaintiff was deprived of a liberty interest.

As to the second step of the analysis, the procedural safeguards to which plaintiff is entitled before being deprived of a constitutionally significant liberty interest are well-established. These requirements include: (1) written notice of the charges; (2) the opportunity to appear at a disciplinary hearing and a reasonable opportunity to present witnesses and evidence in support of the defense, subject to the correctional institution's legitimate safety and penological concerns; (3) a written statement by the hearing officer explaining his decision and the reasons for the action being taken; and (4) in some circumstances, the right to assistance in preparing a defense. *See Wolff v. McDonnell*, 418 U.S. 539, 564–69 (1974); *Sira v. Morton*, 380 F.3d 57, 69 (2d Cir. 2004).

Plaintiff alleges that Semple placed him on high security status without a hearing and also that Semple, together with Chapdelaine, implemented a policy that forced plaintiff to plead guilty to a false disciplinary report (apparently without a hearing). Plaintiff alleges that Santiago and Martin rejected his complaints that he was not receiving adequate notice of his disciplinary charges. Finally, plaintiff alleges that Nemeth, Dousis, Richardson, Conger, Rule, Gonzalez, and Congelos interfered with his ability to present a defense during his disciplinary hearing by denying him the opportunity to call witnesses and present documentary evidence and by placing him in restrictive confinement prior to the hearing. The Court will allow plaintiff's procedural due process claims to proceed against Semple, Santiago, Martin, Nemeth, Dousis, Richardson, Conger, Chapdelaine, Rule, Gonzalez, and Congelos. All other procedural due process claims are dismissed.[2]

---

[2] Plaintiff alleges that several defendants issued false disciplinary reports against him. These allegations do not amount a claim for a violation of due process. *See, e.g. Stockwell v. Santiago*, 2016 WL 7197362, at *4 (D. Conn. 2016) (explaining that "inmates 'have no constitutionally guaranteed immunity from being falsely or wrongly accused of conduct which may result in the deprivation of a protected liberty interest.' . . .[and] '[t]he filing of a false report does not, of itself, implicate the guard who filed it in constitutional violations which occur at a subsequent disciplinary hearing.' . . . An inmate's protection against false accusations lies in the procedural due process requirements to be applied by prison officials who conduct the disciplinary hearing.") (quoting *Freeman v.*

In order to state a substantive due process claim, a plaintiff must allege that government officials have deprived plaintiff of a fundamental constitutional right and that they have done so under circumstances that are no less than "arbitrary" and "outrageous," typically as demonstrated by conduct that "shocks the conscience." *See, e.g.*, *United States v. Medunjanin*, 752 F.3d 576, 590 (2d Cir. 2014) (substantive due process has generally protected "matters relating to marriage, family, procreation, and the right to bodily integrity"); *Natale v. Town of Ridgefield*, 170 F.3d 258, 262–63 (2d Cir. 1999) (substantive due process standards violated "only by conduct that is so outrageously arbitrary as to constitute a gross abuse of governmental authority"); *Velez v. Levy*, 401 F.3d 75, 93–94 (2d Cir. 2005) (describing the "shocks the conscience" standard).

"Where a particular Amendment 'provides an explicit textual source of constitutional protection' against a particular sort of government behavior, 'that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims.'" *Albright v. Oliver*, 510 U.S. 266, 273 (1994) (plurality opinion) (quoting *Graham v. Connor*, 490 U.S. 386, 395 (1989)). Here, the allegations of the complaint appear to be covered by the First Amendment, Eighth Amendment, and procedural due process, for the reasons explained above. I do not understand the complaint to additionally allege a violation of substantive due process distinct from the foregoing claims. Plaintiff's substantive due process claims are therefore dismissed.

---

*Rideout*, 808 F.2d 949, 951 (2d Cir. 1986); *Williams v. Smith*, 781 F.2d 319, 324 (2d Cir. 1986); *Wolff v. McDonnell*, 418 U.S. 539, 564–66 (1974)).

*Equal Protection*

Plaintiff brings a Fourteenth Amendment equal protection claim against numerous defendants. Plaintiff contends that he personally was denied various privileges afforded to other disabled inmates or to other inmates in his housing units.

The Supreme Court has recognized that "[t]he Equal Protection Clause of the Fourteenth Amendment commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985) (quoting *Plyler v. Doe*, 457 U.S. 202, 216 (1982)). A plaintiff may state a violation of the Equal Protection Clause under the "class of one" theory. To state a valid class-of-one claim, a plaintiff must allege that he "has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000).

I conclude that plaintiff has alleged sufficient facts to support plausible class-of-one equal protection claims against defendants Martucci, Maldonado, Wright, Colon, Santiago, Martin, Zegarzewski, Gillette, and Chapdelaine. He alleges that these defendants denied him privileges afforded to other hearing-impaired inmates, such as additional time to use the telephone and medical call boxes provided to inmates with health issues. He also alleges that they improperly placed him in a restrictive housing unit as opposed to a unit for disabled inmates. Plaintiff has not alleged any facts that support a *prima facie* equal protection claim against the other defendants, however. Thus, his equal protection claims are dismissed as to defendants Semple, Gallagher, Maurer, Long, Conger, Santana, Griffen, and Lizon.

*Supervisory liability*

The complaint also alleges that defendants "carelessly and recklessly failed to properly train and supervise [their] employees . . . in that they failed to train [their] employees how to do [their] job correctly, [and] failed to give them proper instruction as to [their] deportment, behavior and conduct as representatives of their employer." Doc. #1-1 at 29–30 (¶ 60). The Court construes this allegation as a claim that those defendants who are supervisors violated plaintiff's constitutional rights by failing to properly train and supervise prison officials. A plaintiff can succeed on such a claim if a supervisor is grossly negligent in supervising an officer who commits a constitutional violation or permits a custom that sanctions unconstitutional conduct to continue. *See Hernandez v. Keane*, 341 F.3d 137, 144 (2d Cir. 2003) (listing five criteria supporting a claim for supervisory liability). But "conclusory, unsupported allegations [of gross negligence or the existence of a policy] are simply insufficient to establish liability of supervisory prison officials under § 1983." *Parris v. New York State Dep't of Correctional Servs.*, 947 F. Supp. 2d 354, 364 (S.D.N.Y. 2013). Because plaintiff's supervisory liability claim is not supported by specific facts, I will dismiss the claim.

CONCLUSION

In accordance with the foregoing analysis, the Court enters the following orders:

(1)     Plaintiff's discrimination and retaliation claims under the ADA and § 504 of the Rehabilitation Act will proceed against defendant Connecticut Department of Correction for monetary damages.

(2)     Plaintiff's First Amendment retaliation claim will proceed against defendants Maldonado, Colon, Griffen, Richardson, Chapdelaine, Hall, and Leightner in their individual capacities for monetary damages.

(3)     Plaintiff's Eighth Amendment deliberate indifference to medical needs claim will proceed against defendants Semple, Gallagher, Maurer, Martucci, Maldonado, Wright, Long, Colon, Santiago, Martin, Zegarzewski, Gillette, Conger, Chapdelaine, Roy, Rule, Gonzalez, Leightner, Marga, Griffen, and Lizon in their individual capacities for monetary damages.

(4)     Plaintiff's Fourteenth Amendment procedural due process claim will proceed against defendants Semple, Santiago, Martin, Nemeth, Dousis, Richardson, Conger, Chapdelaine, Rule, Gonzalez, and Congelos in their individual capacities for monetary damages.

(5)     Plaintiff's Fourteenth Amendment equal protection claim will proceed against defendants Martucci, Maldonado, Wright, Colon, Santiago, Martin, Zegarzewski, Gillette, and Chapdelaine in their individual capacities for monetary damages.

(6)     All other claims not listed above are **DISMISSED**. The Clerk of Court shall dismiss Quiros, Rinaldi, Long, Grimaldi, and Collins as defendants.

(7)     **Within twenty-one (21) days of this Order**, the U.S. Marshals Service shall serve the summons, a copy of the complaint and this order on the DOC in its official capacity by delivering the necessary documents in person to the Office of the Attorney General, 55 Elm Street, Hartford, CT 06141.

(8)     The Clerk shall verify the current work addresses for defendants Semple, Martucci, Maurer, Gallagher, Marga, Vazquez, Maldonado, Wright, Colon, Lizon, Santiago, Martin, Zegarzewski, Gillette, Conger, Nemeth, Dousis, Richardson, Congelos, Griffen, Chapdelaine, Hall, Roy, Santana, Rule, Gonzalez, and Leightner with the DOC Office of Legal Affairs, mail a waiver of service of process request packet containing the complaint to each defendant at the confirmed address within **twenty-one (21) days** of this Order, and report to the court on the status of the waiver request on the **thirty-fifth (35) day after mailing**. If any

defendant fails to return the waiver request, the Clerk shall make arrangements for in-person service by the U.S. Marshals Service on him or her, and the defendant shall be required to pay the costs of such service in accordance with Federal Rule of Civil Procedure 4(d).

(9)     Defendants shall file their response to the complaint, either an answer or motion to dismiss, **within sixty (60) days from the date the notice of lawsuit and waiver of service of summons forms are mailed to them**. If they choose to file an answer, they shall admit or deny the allegations and respond to the cognizable claims recited above. They may also include any and all additional defenses permitted by the Federal Rules.

(10)     Discovery, pursuant to Federal Rules of Civil Procedure 26 through 37, shall be completed **within seven months (210 days) from the date of this order**. Discovery requests need not be filed with the court.

(11)     All motions for summary judgment shall be filed **within eight months (240 days) from the date of this order**.

(12)     Pursuant to Local Civil Rule 7(a), a nonmoving party must respond to dispositive motion within twenty-one (21) days of the date the motion was filed. If no response is filed, or the response is not timely, the dispositive motion can be granted absent objection.

(13)     If plaintiff changes his address at any time during the litigation of this case, Local Court Rule 83.1(c)2 provides that plaintiff MUST notify the court. Failure to do so can result in the dismissal of the case. Plaintiff must give notice of a new address even if he is incarcerated. Plaintiff should write "PLEASE NOTE MY NEW ADDRESS" on the notice. It is not enough to just put the new address on a letter without indicating that it is a new address. If plaintiff has more than one pending case, he should indicate all of the case numbers in the notification of

change of address. Plaintiff should also notify defendants or counsel for defendants of his new address.

It is so ordered.

Dated at New Haven this 8th day of August 2017.

/s/ *Jeffrey Alker Meyer*
Jeffrey Alker Meyer
United States District Judge